IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SANDRA LEE REEDY, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| | : | NO. 19-4916 |
| v. | : | |
| | : | |
| ANDREW M. SAUL,[1] | : | |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

DAVID R. STRAWBRIDGE
UNITED STATES MAGISTRATE JUDGE                           December 29, 2020

This action was brought pursuant to 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner"), which denied the application of Sandra Reedy ("Reedy" or "Plaintiff") for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 301, *et seq.* Presently before the Court is Plaintiff's Statement of Issues and Brief in Support of Request for Review ("Pl. Br.") (Doc. 15); Defendant's Response to Request for Review ("Def. Br.") (Doc. 16); and the record of the proceedings before the Administrative Law Judge ("ALJ") (Doc. 12) (hereinafter "R."). Plaintiff asks the Court to vacate the Commissioner's final administrative decision and remand either for payment of benefits or for further proceedings. The Commissioner seeks the entry of an order affirming the decision of the ALJ that the Plaintiff was not disabled. For the reasons set forth below, we affirm the final decision.

---

[1] Andrew M. Saul was sworn in as the Commissioner of Social Security on June 17, 2019. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, he is substituted for Nancy A. Berryhill as Defendant in this suit.

## I.      FACTUAL AND PROCEDURAL HISTORY

Reedy protectively filed an application for DIB benefits on February 22, 2017, asserting disability beginning on April 17, 2013 arising from her "mental issues."  (R. 16, 69.) She was 47 years old at the time of this alleged onset date ("onset date") and had a date last insured ("DLI") of March 31, 2015. (R. 18, 69.) She holds a Master's degree in Business Administration. (R. 2266.) While the record is unclear regarding the totality of her work history, we observe that Reedy worked as a computer programmer and then, following a lengthy gap in her employment, as a receptionist. (R. 28, 295.) Her most recent work history was as a retail clerk at a seafood market,[2] a job from which she was fired due to her inability "to stand very long." (R. 45.)

Reedy has a history of depressive disorder, anxiety disorder, attention deficit hyperactivity disorder (ADHD), post-traumatic stress disorder (PTSD), and substance use disorder. (R. 19.) Reedy's history of these diagnoses dates back far beyond her onset date, in some cases predating the onset date by decades. (R. 761.) In addition to her mental impairments, the record shows that Reedy has various physical limitations, most notably avascular necrosis[3] and degenerative joint disease of the bilateral hips.[4] She has undergone a number of surgical

---

[2] It is unclear when exactly Reedy's most recent employment ended. Her brief states that she worked at the seafood market in 2013. (Pl. Br. at 4.) However, her work background form states that she worked at the seafood market in 2018. (R. 295.) Further, her disability report states that she stopped working on January 1, 2012. (R. 241.)

[3] "Avascular necrosis is the death of bone tissue due to a lack of blood supply. Also called osteonecrosis, it can lead to tiny breaks in the bone and the bone's eventual collapse." Avascular Necrosis, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/avascular-necrosis/symptoms-causes/syc-20369859. (last visited December 10, 2020).

[4] In addition to avascular necrosis and degenerative joint disease in the bilateral hips, Reedy alleges that she suffers from endometrosis, chronic obstructive pulmonary disease (COPD), glaucoma, and gastroesophagal reflux disease (GERD). (R. 18–19.) Of these conditions, the ALJ determined that only her avascular necrosis and degenerative joint disease constituted a "severe impairment" bearing on the RFC determination. (R. 18–19.) However, because the subject of Reedy's appeal is narrowly limited to the ALJ's determinations regarding her mental impairments, a discussion of her physical impairments is unnecessary. (Pl. Br. at 5–7.)

procedures on her hips as a result of these conditions, including hip replacements in 2005 and 2006 and revision surgeries in 2010 and 2012. (R. 330.) However, the subject matter of her claim in this appeal has been narrowed to "mental issues." (R. 69, 241.)

Reedy has received treatment for her "mental issues" from three organizations: Berks Counseling Center ("BCC"), Reading Hospital ("Reading Hospital"), and Alternative Consulting Enterprises ("ACE").[5] At the time of her 2013 onset date, she was treating at BCC with psychiatrist Dr. David Abbott. (R. 737–38.) As part of this treatment, she was prescribed Adderall, Celexa, Trazadone, Vistaril and Ativan. (R. 738, 740, 746.) Throughout 2013, she was generally "stable on her medications with no psychiatric symptoms." (R. 741, 744.) Throughout 2014, Reedy occasionally reported increased symptoms of her mental health impairments, but her condition remained generally stable and she did not require any change in her medications. (R. 759.) We have no record of her treatment from BCC after her October 29, 2014 appointment, other than for her March 31, 2015 discharge. (R. 777.)

In addition to BCC, Reedy received sporadic mental health treatment at Reading Hospital from 2014 through 2016. She had only two Reading Hospital appointments prior to her DLI where she received treatment for her mental health conditions. At an October 2014 appointment, Reedy's primary care physician ("PCP") noted that her fatigue had improved and that her depression and anxiety symptoms were stable. (R. 2048.) Still, her PCP prescribed Ativan for anxiety, Trazadone for insomnia, and Adderall for ADHD. (R. 2049.) At a March 2015 appointment, Reedy reported worsened anxiety, but her condition was stabilized with the addition of Ativan to her medication regimen. (R. 2054–55.) Reedy also suffered temporary

---

[5]  Some documentation in the record refers to "Alternative Counseling Services." This organization is the same as ACE. We simply refer to the organization as "ACE" throughout this opinion.

relapses regarding her substance use disorder in April and May 2016, for which she was admitted to Reading Hospital for two separate two-day stints, but each of these events occurred more than a year after her DLI. (R. 1344–46, 1444.)

Reedy also received treatment at ACE beginning in January 2016 and continuing at least until the date of her hearing in July 2018, all of which was well after her DLI. (R. 51, 646.) While treating at ACE, Reedy was diagnosed with bipolar disorder in addition to her previous diagnoses of ADHD, PTSD, anxiety, and depression. (R. 1841, 1837.) While she reported that she occasionally experienced depressive, anxiety, and bipolar episodes of varying degrees, her medication regimen remained the same. (R. 1841, 1839, 1837, 1835.)

With regard to her activities of daily living, Reedy testified that she lived with her 86 year old mother, for whom she provides care and holds power of attorney. (R. 46–47.) She stated that she is able to drive and use public transportation if necessary. (*Id.*) She explained that she does the grocery shopping for herself and her mother, cooks for the two of them three times a week, and regularly does laundry, cleans dishes, and runs the vacuum cleaner. (R. 47–48.) Further, in her daily activities questionnaire, Reedy stated that on a once a week basis she would do "grocery shopping, church, movies, and therapy sessions" outside the home. (R. 262.) She reported that her hobbies included playing cards, sudoku puzzles, games, and bird watching. (R. 263.) She also stated that she reads the newspaper and short stories for one hour per day. (*Id.*)

After Reedy's claim was initially denied by the state agency, she requested a hearing before an ALJ. (R. 90–92.) The hearing was held on July 23, 2018. (R. 36.) Plaintiff appeared with counsel and both she and a vocational expert ("VE") testified. (R. 36–38.) On September 27, 2018, the ALJ issued a decision denying her application. (R. 13–30.) He explained, "[T]hrough the date last insured, considering the claimant's age, education, work experience, and

4

residual functional capacity, the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." (R. 29.) Accordingly, the ALJ found that she is "not disabled." (*Id.*) The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1–3.) This litigation followed.

## II.    STANDARD OF REVIEW

This Court must determine whether substantial evidence supports the Commissioner's decision.   42 U.S.C. § 405(g); *Rutherford v. Barnhart*, 399 F. 3d 546, 552 (3d Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003).  Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of evidence."   *Rutherford*, 399 F.3d at 552.  The factual findings of the Commissioner must be accepted as conclusive, provided they are supported by substantial evidence.  *Richardson*, 402 U.S. at 390 (citing 42 U.S.C § 405(g); *Rutherford*, 39 F.3d at 552).  The review of legal questions presented by the Commissioner's decision, however, is plenary.  *Shaudeck v. Commissioner of Social Security Admin.*, 181 F.3d 429, 431 (3d Cir. 1999).

## III.   DECISION UNDER REVIEW

The issue before the ALJ at the time of his September 27, 2018 decision was whether Reedy had been disabled within the meaning of the Act from her onset date of April 17, 2013, through her March 31, 2015 DLI. In making this determination, he relied upon the familiar five-step sequential evaluation process set forth in 20 C.F.R. § 404.1520(a). At Step One, the ALJ found that Reedy had not engaged in substantial gainful activity during the period from her onset

date through the DLI. (R. 18.) At Step Two, he found that Reedy had demonstrated that she suffered from severe, medically-determinable impairments, *i.e.*, ones that cause functional limitations and have more than a *de minimus* effect on her ability to perform basic work activities. (R. 18–19.) At Step Three, the ALJ concluded that Reedy did not have an impairment or combination of impairments that satisfy the criteria of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1, and therefore could not establish her entitlement to benefits on that basis, requiring that the evaluation process continue. (R. 19–21.) Plaintiff does not challenge these findings.

The ALJ then considered Reedy's residual functional capacity ("RFC"), which is defined as "the most [a claimant] can do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). The ALJ determined:

> **[T]he claimant had the residual function capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she could only occasionally balance, crouch, crawl, stoop, bend, or kneel and occasionally climb stairs or ramps. The claimant could not climb ladders, ropes, or scaffolds. The claimant could not be exposed to unprotected heights, dangerous or moving machinery and machine parts. The claimant would be capable of work with simple, routine, and repetitive instructions in low stress jobs which are jobs that I define as goal oriented and which do not have an assembly line, piece work, or numerical production quota pace, a job in which the claimant would be limited to occasional decision making, occasional changes of workplace setting and occasional changes to workplace routine, and a job in which she has only occasional contacts with supervisors, co-workers, and customers.**

(R. 21.) (bold in original). In formulating this RFC, the ALJ followed a two-step analysis: looking at whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's pain or other symptoms, and then considering the extent to which the intensity, persistence, and limiting effects of Plaintiff's symptoms limit

her functional limitations. (R. 21.) Here, the ALJ first found the Plaintiff does have medically determinable impairments that could reasonably be expected to cause the alleged symptoms. (R. 26.) However, he next found that Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were not consistent with the medical evidence, and that the medical record supported his conclusion that the Plaintiff was capable of completing "low stress jobs." (*Id.*, R. 28.)

Applying this RFC, the ALJ found at Step Four that Plaintiff was unable to perform any past relevant work.  (R. 28.)  The ALJ then proceeded to Step Five to determine whether Reedy was capable of performing any other jobs that exist in significant numbers in the national economy.  The ALJ found that Medical Vocational Rule 201.21 did not necessarily lead to a decision that Reedy was "not disabled" because her ability to perform the full range of sedentary work was impeded by additional limitations. (R. 29.) Nonetheless, following the Rule 201.21 framework, the ALJ ultimately concluded that Reedy was "not disabled." (R. 28–29.) This conclusion was based primarily on the VE's testimony that, given the ALJ's RFC finding, jobs existed in significant numbers in the national economy that Plaintiff could have performed. (R. 29.) Accordingly, the ALJ found that Reedy had not been under a disability as defined in the Act from April 17, 2013 through the DLI, March 31, 2015. (R. 29.)

## IV.    DISCUSSION

Reedy makes two related arguments as to why the ALJ's decision should be vacated. First, she argues that the ALJ's RFC determination was not supported by substantial evidence in that the ALJ failed to give adequate weight to her mental health treatment records. Next, she argues that the ALJ erred in not adopting one of the several related opinions the vocational

expert expressed in response to one of the hypotheticals presented. We address each of these arguments and conclude that both lack merit.

### A. Substantial evidence supports the ALJ's evaluation of Plaintiff's mental health as it relates to the RFC finding.

Plaintiff argues that the ALJ's RFC finding was not supported by substantial evidence in that the ALJ "failed to give adequate weight to the treatment history for her mental health conditions," (Pl. Br. at 5) and that "the opinions set forth in the Plaintiff's mental health care records should be given full weight." (Pl. Br. at 7.) But Plaintiff fails to identify any specific RFC determination where the ALJ purportedly failed to give adequate weight. (Pl. Br. at 5.) Rather, Plaintiff refers generally and vaguely to the entirety of her "mental health care records" from BCC, Reading Hospital, and ACE. She points to no specific evidence where the ALJ purportedly failed to give adequate weight. Instead, her brief highlights portions of the medical record and hearing testimony that she contends contradict the ALJ's RFC determination. In our review of the record, however, we observe that the only opinion evidence set out does not concern any of Reedy's *mental* impairments, but rather concerns her *physical* impairments. In evaluating this RFC determination, we first set out the regulations pursuant to which the ALJ must review the relevant evidence. We next address the opinion evidence and then focus primarily on the mental health treatment records making up the bulk of Plaintiff's brief. We conclude that these records provide substantial evidence in support of the ALJ's RFC determination.

### 1. Applicable regulations

Where the ALJ is satisfied, based on the evidence, that a claimant has a medically-determinable impairment that could reasonably be expected to produce the symptoms alleged (but would not meet or exceed a listing), he must determine the extent to which the claimant's

symptoms actually limit her capacity to work. *See* 20 C.F.R. § 404.1529(c)(1). The regulations set forth a process by which an ALJ is to consider a claimant's descriptions of her symptoms and assess the extent to which those symptoms can reasonably be accepted as consistent with the objective medical and other evidence of record. *See* 20 C.F.R. § 404.1529(a). In so doing, the ALJ must consider all objective medical evidence including: a claimant's treatment history; statements regarding the location, duration, frequency and intensity of the claimant's symptoms; any precipitating and aggravating factors; measures used to reduce the symptoms; as well as the type, dosage, effectiveness and side effects of medication taken to alleviate those symptoms. 20 C.F.R. § 404.1529(c)(1)-(3). The ALJ must likewise consider any other relevant evidence, including factors concerning functional limitations and restrictions due to the claimant's symptoms, the claimant's work history, and her daily activities.

Pertinent to a proper RFC determination are medical opinions, or, "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment . . . ." 20 C.F.R. § 404.1527(a)(2).[6] A case should not, however, "be decided in reliance on a medical opinion without some reasonable support for the opinion." SSR 96–2,[7] 61 Fed.Reg. 34490. In determining what weight to give a medical opinion, an ALJ must consider certain factors, including: the examining relationship, the treating relationship, supportability, and consistency with the record as a whole. 20 C.F.R. § 404.1527(d).

---

[6] We note that this section of the regulations was amended on March 27, 2017. However, here, the Plaintiff's claim was filed February 22, 2017. (R. 16.) Accordingly, the version of the regulations in effect from August 24, 2012 until March 26, 2017 applies here. *See* 20 C.F.R. § 404.1527 ("For claims filed before March 27, 2017, the rules in this section apply.").

[7] SSR 96–2 was rescinded on March 27, 2017. However, this rescission is only effective for claims filed on or after that date. As this claim was filed on February 2017, the rescission does not apply.

With respect to treating physicians, the ALJ would normally "accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patients condition over a prolonged period of time." *Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir.2008) (quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir.2000)). The ALJ is also required, however, to "consider the medical findings that support a treating physician's opinion that the claimant is disabled," and where a treating physician's opinion "conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit." *Morales*, 225 F.3d at 317. The ALJ cannot, of course, simply "reject evidence for no reason or for the wrong reason" and, when specifically deciding "to reject the treating physician's assessment, [the ALJ] may not 'make speculative inferences from medical reports' and may reject 'a treating physician's opinion outright only on the basis of contradictory medical evidence' and not due to his or her own credibility judgments, speculation or lay opinion." *Id.* (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999)).

### 2.    Opinion Evidence

Plaintiff sets out the legal standard regarding the weight to be afforded to a treating source's RFC opinion, and then makes frequent reference to "opinions" set forth in her mental health care records. (Pl. Br. at 5–7.) However, the only opinion evidence in the record before us is that of Reedy's family physician, Dr. Bina Jain, and the state agency medical experts. The state agency opinion was inconclusive, as it found there was insufficient evidence to determine whether Reedy was disabled during the period from her onset date to her DLI. (R. 72–73.) Understanding that Plaintiff has not expressly identified the particular opinion evidence she contends was given less than adequate weight, we glean that she refers to Dr. Jain's RFC opinion, rendered on May 18, 2018. (R. 2260.)

In that "opinion," Dr. Jain notes that Reedy's "experience with pain or other symptoms [is *frequently*] severe enough to interfere with attention and concentration needed to perform simple work tasks." (R. 2261) (emphasis added). The opinion form Dr. Jain filled out defines "frequently" to mean "34% to 66% of an 8-hour working day." (*Id.*) Dr. Jain then goes on to state that Reedy is capable of "low physical stress jobs." (*Id.*) Taken together, it appears that Dr. Jain's opinion regarding Reedy's inability to concentrate is based on her *physical*, not her *mental*, impairments. Indeed, Dr. Jain stated that Reedy's inability to concentrate is a result of her "pain or other symptoms" and that she could perform "low physical stress jobs," *i.e.*, jobs that would mitigate the physical pain she experiences during the day. (*Id.*) We also note that Dr. Jain left blank both of the spaces on the opinion form in which to state whether any psychological or emotional conditions impacted Reedy's ability to work. (R. 2261, 2263.)

The ALJ stated that he gave Dr. Jain's opinion "partial weight." (R. 27.) He justified doing so based on the fact that Dr. Jain's opinion was rendered "over three years after [Reedy's] remote date last insured." (*Id.*) The ALJ further stated that Dr. Jain's opinion regarding the pain Reedy would experience during the day, which impacted her ability to concentrate, was "only partially supported by the objective evidence, which . . . indicated that [Reedy] fully recovered from her bilateral hip revision surgery with improved pain and mobility." (*Id.*)

We conclude that the ALJ's assignment of only partial weight to Dr. Jain's opinion is adequately supported. Moreover, for the purposes of this claim, concerning only Reedy's *mental* impairments, we find that the ALJ's RFC determination is consistent with Dr. Jain's opinion that Plaintiff could perform "low physical stress jobs." This opinion is consistent with the ALJ's RFC finding that Reedy was "capable of [sedentary] work with simple, routine, and repetitive instructions in low stress jobs." (R. 21.)

### 3. Plaintiff's mental health treatment records

The remainder of Reedy's "mental health treatment records" does not include any RFC opinions from treating sources. Accordingly, we need only determine whether the ALJ properly considered the treatment records and whether they support the ALJ's RFC determination. We first set out the relevant records to which Plaintiff refers—those from BCC, Reading Hospital, and ACE—and then determine whether the ALJ sufficiently considered them in formulating the RFC.

During the relevant period from her onset date to her DLI, April 17, 2013 through March 31, 2015, Reedy first treated at BCC with psychiatrist Dr. David Abbott. As part of this treatment plan, Dr. Abbott prescribed Adderall, Celexa, and Trazadone. Reedy attended an in-person appointment with Dr. Abbott on June 26, 2013, where she reported heightened anxiety, for which the doctor prescribed her a trial of Vistaril. (R. 740.) At follow up visits on July 31, 2013 and August 28, 2013, Reedy was noted to be "stable on her medications with no psychiatric symptoms." (R. 741, 744.) However, at a September 25, 2013 appointment, Reedy reported increased anxiety due to her fear that she had an aortic aneurysm. (R. 746.) She reported that Vistaril did not control her increased anxiety, and Dr. Abbott then prescribed Ativan as a substitute. (*Id.*) At subsequent follow-ups on October 23, 2013 and November 20, 2013, Reedy reported that her symptoms had stabilized on her new medication regimen. (R. 749, 751.)

Reedy was next seen in-person on January 16, 2014, this time by psychiatrist Dr. Lysette Ramos. (R. 755.) At this appointment, Reedy reported that she was still stable on her medications, but that she had discontinued Vistaril "because it was too sedating in addition to the Ativan." (*Id.*) At a follow-up appointment with Dr. Ramos on March 13, 2014, Reedy reported that her symptoms remained stable and did not require any change in her medications. (R. 759.)

She was recommended to return in three months for a follow-up with psychiatrist Dr. Manjit Vohra. (*Id.*)

Reedy returned for that appointment on June 4, 2014, and Dr. Vohra conducted a psychiatric diagnostic evaluation. (R. 761–63.) In this evaluation, Reedy discussed her history of PTSD stemming from her fiancé's death 25 years before. (R. 761.) She also discussed her history of drug and alcohol abuse; however, she stated that she had not used in the two years prior to the evaluation. (*Id.*) With regard to her symptoms at that time, Reedy reported lack of concentration, inability to keep thoughts straight, depression, isolation, anxiety, periods of hyperactivity, and weekly panic attacks. (R. 764.) Dr. Vohra diagnosed Reedy with ADHD, depressive disorder, PTSD, and cocaine dependence in early remission. (*Id.*) Dr. Vohra noted Reedy's poor insight, judgment, and memory, as well as disturbed attention and concentration, but that Reedy was "stable on her current medications" and denied "any residual symptoms with any of the above diagnoses," namely, depression, ADHD, and PTSD. (R. 761, 762.) Dr. Vohra recommended no change in Reedy's medication regimen and directed her to return for a follow-up appointment in three months. (*Id.*)

At follow-up appointments on August 27, 2014 and October 29, 2014, Reedy reported increased anxiety and problems sleeping. (R. 766, R. 774.) However, she declined any changes in her medications, as it was recommended that she continue on her current regimens. (*Id.*) Throughout her treatment at BCC, the record indicates that Reedy's mental state was stable far more often than not, and even that she was frequently searching for jobs. *See* R. 741; R. 744; R. 749; R. 751; R. 755; R. 759; R. 766; R. 773; R. 774. Reedy was discharged from BCC on March 31, 2015, as there had been no contact after the October 29, 2014 appointment. (R. 777.)

During this time interval, Reedy was also receiving mental health treatment at Reading Hospital. The record shows that her mental condition was the subject of two appointments, one on October 30, 2014 and a second on March 26, 2015. (R. 2049, R. 2054.) At her October 2014 appointment, Reedy's PCP noted that her fatigue had improved and that her depression and anxiety symptoms were stable. (R. 2048.) Still, her PCP continued her prescriptions of Ativan for anxiety, Trazadone for insomnia, and Adderall for ADHD. (R. 2049.) Reedy returned for a follow-up appointment with her PCP on March 26, 2015 where she reported greater anxiety for which she was prescribed Ativan. (R. 2054.) At a subsequent appointment following her DLI, Reedy reported that her anxiety was stabilized following the addition of Ativan. (R. 2055.)

In addition to the treatment records from the relevant time period, Plaintiff's brief extensively discusses treatment received after the DLI at Reading Hospital and ACE. This treatment can be considered only to the extent that it may shed light on Reedy's condition during the relevant time period. Accordingly, we present here only the most significant information. In particular, Reedy suffered temporary relapses regarding her substance use disorder in April and May 2016, over a year after her DLI, for which she was admitted to Reading Hospital for two different two-day stints (R. 1344–46, 1444.)

Reedy also received treatment at ACE beginning in January 2016 and continuing at least until the date of her hearing in July 2018. (R. 51, 646.) She primarily treated with psychiatrist Dr. Vicki Morrow, at ACE. The record illustrates that Reedy's symptoms during her ACE treatment fluctuated and ranged from stable to severe at times. *See, e.g.*, R. 636. However, the record also reflects confidence on the part of Dr. Morrow that Reedy would be able to work a job, and that, in fact, finding a job would be highly beneficial to her. (R. 646, 2267.) In fact, Dr. Morrow noted on one evaluation: "[Reedy] should continue to actively seek employment to help increase her

self-esteem. *If the correct job is found, [Reedy] could really flourish*." (R. 2267) (emphasis added).

### 4.      Reedy's mental health treatment records support the RFC finding

On the above record, we find that substantial evidence supports the RFC determination and that the ALJ properly considered Reedy's mental health records in formulating it. The portion of the RFC relevant to Reedy's mental limitations provides that:

> [Reedy] would be capable of work with simple, routine, and repetitive instructions in low stress jobs which are jobs define[d] as goal oriented and which do not have an assembly line, piece work, or numerical production quota pace, a job in which the claimant would be limited to occasional decision making, occasional changes of workplace setting and occasional changes to workplace routine, and a job in which she has only occasional contacts with supervisors, co-workers, and customers.

(R. 21.) Plaintiff contends that this RFC does not give adequate weight to the mental health treatment record, and specifically that it does account for Plaintiff's inability to concentrate. (Pl. Br. at 4–5.) However, this RFC effectively limits Reedy from "jobs that require intensive concentration." (R. 27.) Moreover, the record is clear that Reedy's mental state during the relevant period was generally stable and that her issues with concentration were minimal. For example, Reedy's BCC treatment records, which encompass much of the relevant time period, illustrate that her mental state was generally stable on her medications, and even that she was frequently searching for jobs. *See* R. 741; R. 744; R. 749; R. 751; R. 755; R. 759; R. 766; R. 773; R. 774. Reedy's Reading Hospital treatment records during the relevant time period also support that her symptoms were stable on her medications. (R. 2049, 2055.) Finally, her ACE treatment records—which pertain entirely to treatment after the DLI but which Plaintiff relies on heavily in her brief—illustate not only that she was capable of working but that her treating psychiatrist actually *recommended* it. (R. 2267)

Further, in formulating the RFC, the ALJ properly considered the objective medical evidence along with Reedy's symptoms, work history, and daily activities. In reviewing the medical evidence, the ALJ provided a detailed discussion of Reedy's treatment at BCC, Reading Hospital, and ACE, in which he considered Reedy's statements to her doctors, diagnoses she received, and treatment plans prescribed to her. *See* R. 24–25 (BCC); R. 25 (Reading Hospital); R. 26 (ACE). For example, the ALJ specifically discussed the June 2014 psychiatric evaluation, to which Plaintiff points for evidence of her inability to concentrate (Pl. Br. at 6), and explained that he viewed that evaluation within the context of several more favorable reports. (R. 25.) Further, with regard to the Reading Hospital records, the ALJ specifically noted that Reedy occasionally reported increased severity of her anxiety and depression symptoms, but that these symptoms were stabilized with changes to her medications. (*Id.*) The ALJ also discussed treatment records from after Reedy's DLI, specifically considering her relapses in April and May of 2016, as well as her treatment with Dr. Morrow at ACE. (R. 26.) Finally, in conjunction with the treatment records, the ALJ considered Reedy's testimony at the hearing "that she engages in many normal daily activities despite her symptoms." (*Id.*)

### B.   The ALJ properly relied on the vocational expert's testimony

Plaintiff's second, related argument, is that the ALJ should have "adopted the opinion of the vocational expert that the Plaintiff was unable to perform any type of substantial gainful activity." (Pl Br. at 5.) The VE rendered this opinion in response to a hypothetical the ALJ posed in which he inquired as to whether Plaintiff would be capable of completing any jobs if she would be off task more than ten percent of the time or would miss more than one day per month due to concentration issues. (R. 65–66.) We find that the ALJ was not required to adopt this opinion and that his reliance on the VE's responses to other hypotheticals was proper.

"A hypothetical question must reflect all of a claimant's impairments that are supported by the record." *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987). Where an ALJ's hypothetical question to a VE "fairly sets forth every credible limitation established in the phyiscal evdience," the response to that question may be relied upon as substantial evidence. *Plummer v. Apfel*, 186 F.3d 422, 431 (3d Cir. 1999). An ALJ is under no obligation to ask hypothetical questions that include limitations that he believes are not consistent with the record. *Id.* While the ALJ is not *required* to ask hypotheticals that are inconsistent with the record, he may and often does "proffer a variety of assumptions to the [VE]." However, for the purposes of determining disability, the ALJ may only consider the answers to questions that "accurately portray[] the claimant's individual physical and mental impairments." *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984) (internal citation omitted).

Here, the ALJ proferred a series of hypotheticals to the VE. (R. 65–66.) Each of these hypotheticals included various limitations that affected the VE's reponse with respect to which, if any, jobs exist in the national economy that someone similarly situated to Plaintiff with the hypothetical limitations could complete. (*Id.*) In response to a hypothetical in which the limitations mirrored those included in the RFC, the VE answered that at least two jobs exist in the national economy that such a person could complete: mail sort clerk and video surveillance monitor. (R. 65.) In a subsequent hypothetical, the ALJ posed a question about an individual who had the limitations included in the RFC and who additionally "would be off task greater than ten percent of the time and/or miss more than one day a month from inability to concentrate." (*Id.*) In response to this question, the VE stated that there are no jobs in the national economy that such an individual would be capable of completing. (R. 66.)

We have already concluded that the ALJ's RFC determination was supported by sustantial evidence. Accordingly, when the ALJ asked the VE a hypothetical that mirrored the limitations included in the RFC, the answer to that hypothetical was properly relied on as substantial evidence in determining whether a disability exists. Conversely, the hypothetical that Plaintiff argues should be controlling included additional limitations that were not supported in the RFC and that do not accurately characterize Plaintiff's mental impairments. The ALJ is therefore precluded from crediting the VE's response to this hypothetical. We find that the ALJ's reliance on the VE's response to a hypothetical question in the which limitations matched the RFC was proper. We further find that the ALJ's decision not to credit the subsequent hypothetical that included additional limitations was proper.

## V.    CONCLUSION

Plaintiff presented two related arguments: First, that the ALJ's RFC finding was not supported by her mental health treatment records, and second, that the ALJ erred in not adopting certain VE testimony in the disability determination. We find that substantial evidence supports the RFC finding in that Reedy's mental health treatment records are consistent with the ALJ's analysis. Further, we find that the ALJ properly discounted the relevant VE testimony in light of affirmative responses to other hypotheticals as set out above. Accordingly, the opinion of the ALJ is affirmed. An appropriate order follows.